**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION<br><br>This document relates to: All cases. | MASTER DOCKET<br><br>18-md-2865 (LAK) |

## DECLARATION OF NEIL J. OXFORD

I, Neil J. Oxford, an attorney duly admitted to practice law before the courts of the State of New York, hereby declare under penalty of perjury:

1. I am a partner at Hughes Hubbard & Reed LLP, counsel for Plaintiff Skatteforvaltningen ("SKAT"), the Customs and Tax Administration of the Kingdom of Denmark, in these actions. I am fully familiar with the matters set forth in this declaration.

2. I submit this declaration in support of SKAT's Memorandum of Law in Support of its Motion for Issuance of a Request for International Judicial Assistance to Obtain Evidence (Letters Rogatory). The facts stated in this declaration are true to the best of my knowledge and belief.

3. Attached hereto as Exhibit 1-A – 1-M are proposed Letters of Request for International Judicial Assistance Pursuant to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters.

4. Attached hereto as Exhibit 2 is the Amended Complaint from SKAT v. The Bradley London Pension Plan & Doston Bradley, No. 18-cv-04047-LAK (S.D.N.Y. April 24, 2020).

I.      **CASE BACKGROUND**

5.      In May and June 2018, Plaintiff SKAT filed 140 similar complaints in eleven different federal judicial districts. On October 3, 2018, the federal complaints were consolidated in a Multi-District Litigation ("MDL") and assigned to the Honorable Lewis A. Kaplan. On February 26, 27, and 29, 2019, SKAT filed 43 additional complaints, which were consolidated into the MDL assigned to Judge Kaplan. On November 19, 2019, SKAT filed an additional related complaint, which has also been incorporated into the MDL.

6.      This case stems from an allegedly fraudulent tax refund scheme to deceive SKAT into paying out over 12.7 billion Danish Kroner ("DKK"), the equivalent of approximately $2.1 billion (US), of allegedly withheld dividend tax. Each of over 300 entities that claimed tax refunds ("SKAT Refund Claimants") represented themselves as pension plans purporting to own shares in Danish companies listed on the OMX Copenhagen 20 Index, the 20 most-traded stocks in Denmark ("Danish Securities").

7.      Danish companies are required to withhold 27% tax on dividends they pay to shareholders. Under certain double taxation treaties between Denmark and other countries, including the United States, this tax is reimbursable to certain non-Danish shareholders.

8.      The SKAT Refund Claimants, acting through their agents and representatives, applied to SKAT claiming repayment of dividend withholding tax ("DWT") allegedly withheld on dividends that they purported to have earned on shares of Danish companies that they claimed to own. These applications were fraudulent because the SKAT Refund Claimants did not own the shares they claimed to own, did not earn the dividends they claimed to have earned, and were not entitled to the tax refunds they claimed. These applications were also fraudulent because the claimants falsely represented that they met the qualifications set forth in the double taxation

treaty between Denmark and the United States for a full repayment of the tax withheld on dividends. Based on the fraudulent tax refund claims, SKAT paid baseless withholding tax refunds of approximately $1,234,288,400 (US) to the SKAT Refund Claimants. SKAT Refund Claimants that were based in the United States, along with certain of their authorized representatives, partners, and otherwise affiliated individuals, are the "Defendants."

9. The principal organizer of the scheme for a vast majority of the Defendants is believed to be Sanjay Shah ("Shah"), who through his company Elysium Global (Dubai) Limited controlled, directed, and/or influenced many of the parties that effectuated the scheme, including custodians, payment agents, trading counterparties, and entities that acted as conduits for distribution of the proceeds of the fraudulently obtained refund payments.

10. The third parties involved in the scheme fall into the following categories:

   a. Custodians, which purported to hold the shares for Defendants and for trading counterparties, and to clear trades after they had been executed. The Custodians issued "credit advices," which Defendants submitted in their refund applications to SKAT, to document Defendants' purported ownership of shares.

   b. Payment Agents, which submitted Defendants' refund claims to SKAT.

   c. Trading Counterparties, with which Defendants purported to trade in order to generate the fraudulent trading records necessary to claim DWT refunds from SKAT, were typically British Virgin Islands ("BVI") or Cayman Islands ("Cayman") companies. The Trading Counterparties played a variety of different roles, as further set out at paragraphs 26 to 29 below.

      d.   Conduit Entities, which were involved in channeling the funds to the perpetrators of the fraud after SKAT paid out the DWT refunds, and were also typically BVI or Cayman companies.

11.    All of the offshore companies to which the Letters Rogatory relate were involved in the scheme in at least one of these capacities. In some cases SKAT has already obtained direct evidence that Shah and his associates controlled a number of these companies. While the majority of the Defendants submitted "credit advices" provided by custodians controlled by or related to Sanjay Shah, approximately 10% of the fraudulent claims were submitted to SKAT using "credit advices" from ED&F Man Capital Markets ("ED&F Man"). SKAT has obtained evidence that a number of Cayman companies listed below were involved in this portion of the fraudulent applications and received significant shares of the proceeds of the fraudulent reclaims.

12.    A number of BVI and Cayman companies were used in the scheme as Trading Counterparties or Conduit Entities. The Cayman companies in question (each a "Cayman Third Party" and collectively the "Cayman Third Parties") are: Abra Holdings (Cayman) Inc.; Aduro Investments LP; Amalthea Enterprises Ltd.; Aquila (Cayman) Limited; Ballygate Capital Ltd.; Black Square Ltd; Chem Capital; Colbrook Ltd; Cork Oak Capital Ltd.; D.D.C (Cayman); DE Market View; Esengi Ltd; Ganymede Cayman Ltd.; Glendale Market Consultants; Greytek Capital Ltd.; Hertfordshire Ltd.; IP Universal Limited; Kentaurus Limited; La Tresorerie Management Limited; Leda Cayman Limited; Metis Cayman Limited; Neoteric Limited; Omega Investments, LP; Opal Capital; Pintal GP Limited; Procap Trading; RDKS Consultants; Sherwood Enterprises Ltd.; SPK 23 (Cayman) Inc.; T & S Capital; Westview GP Limited; and Worldwide Asset Management Limited.

13. The Cayman Third Parties were generally clients of Shah-controlled Custodians and are believed to be connected to Shah in other ways. For example, some individuals who established the Cayman Third Parties claim to have set up these companies at Shah's request, or have another personal or professional connection to Shah. In some cases, public information shows that Shah was himself in control of the companies at issue. Company searches conducted by Kobre & Kim (Cayman) at the Cayman Islands General Registry identify Shah as a director of IP Universal Limited, a Cayman Islands company that is itself a director of Ganymede Cayman Ltd. and T & S Capital. Ganymede Ltd. and T&S Capital are two of the Cayman Third Parties to which the Letters Rogatory relate.

14. SKAT's case is that the Defendants used the Cayman Third Parties and other offshore companies to advance their fraudulent scheme and conceal their involvement in it.

I. **SKAT'S DISCOVERY CONCERNING THE FRAUD**

15. In seeking discovery of the fraudulent scheme, SKAT has obtained documents (including the documents attached as Exhibits 3 – 14 to this declaration) from various sources that include:

    a. Defendants' productions in SKAT's U.S. litigation;

    b. SKAT's action pending before the Dubai International Financial Centre Courts (the "DIFC court") against Elysium Global (Dubai) Limited and Elysium Properties Limited, another Shah-controlled company (together, "Elysium"); and

    c. the BVI Registry of Companies and the Cayman Islands General Registry.

16. On September 26, 2018, SKAT commenced its action in the DIFC court against Elysium, alleging that the companies participated in the fraud of certain of the Defendants in the U.S. proceedings or received proceeds of the fraud.

17.     During 2018, the DIFC court entered orders granting SKAT's applications to search Elysium's offices in Dubai for documents relevant to SKAT's claims. As a result of these orders, approximately 9 million unique documents were collected from Elysium. Under procedures established by the DIFC court, the documents are reviewed for legal privilege by a neutral third party before being turned over to SKAT, including procedures for determining any claims of privilege that Elysium may assert with respect to particular documents. To date, approximately 6 million unprivileged Elysium documents have been disclosed to SKAT. On December 26, 2018, the DIFC court granted SKAT permission to use the Elysium documents in proceedings in the United States. Exhibit 3 at 2. By Order dated March 5, 2020, this Court provided for SKAT's production of these documents to Defendants pursuant to the protections of the Court's Amended Stipulated Protective Order Governing Confidentiality of Discovery Materials, No. 18-md-2865, ECF No. 287.

## II.     INFORMATION SOUGHT FROM CSPs

18.     SKAT seeks information from the licensed corporate services providers (each a "CSP") that provide, or that have provided, the Cayman Third Parties with corporate services set out, for example, in section 3 of the Companies Management Law in the Cayman Islands. Specifically, SKAT seeks documents from the following CSPs:

    **a. Cayman CSPs:**

- Bell Rock Corporate Services ("Bell Rock")
- Campbells Corporate Services Limited ("Campbells")
- CO Services Cayman Limited ("CO Services")
- DMS Corporate Services Ltd. ("DMS")
- Forbes Hare Trust Company Limited ("Forbes Hare")
- Genesis Trust & Corporate Services Ltd. ("Genesis")

- Harneys Services (Cayman) Limited, n/k/a Harneys Fiduciary (Cayman) Limited[1] ("Harneys (Cayman)")
- Intertrust Corporate Services (C.I.) Limited, n/k/a Intertrust Corporate Services (Cayman) Limited[2] ("Intertrust")
- Ocorian (Cayman) Limited ("Ocorian")
- Sterling Trust (Cayman) Limited ("Sterling Trust")
- Trident Trust Company (Cayman) Limited ("Trident")
- Vistra (Cayman) Limited ("Vistra (Cayman)")
- Walkers Corporate Limited ("Walkers")

19. SKAT seeks the following documents in respect of each Cayman Third Party that is a limited company:

    a. Certificate of incorporation;

    b. Articles of association;

    c. Memorandum of association;

    d. Register of shareholders;

    e. Register of directors;

    f. Register of beneficial owners;

    g. Books of Account;

    h. Customer due diligence records obtained by the CSP pursuant to the Anti-Money Laundering Regulations;

    i. In respect of the Cayman Third Parties that have been voluntarily wound up, the documents filed with the Registrar of Companies under Order 13 rule 2 of the Companies Winding Up Rules, including:

---

1. Harneys Services (Cayman) Limited merged with Harneys Fiduciary (Cayman) Limited in 2017.
2. Intertrust Corporate Services (C.I.) Limited merged with Intertrust Corporate Services (Cayman) Limited in 2018.

7

      i. Declaration of solvency filed pursuant to the Companies Winding Up Rules;

      ii. Notice of the winding up;

      iii. Voluntary liquidator's consent to act;

      iv. Final return;

j. Correspondence between clients of record and the CSP;

k. Correspondence between introducers and the CSP;

l. Correspondence between directors and the CSP;

m. Agreements for the provision of corporate services between the CSP and the Cayman Third Parties, or those acting on their behalf; and

n. Invoices issued by the CSP to any of the Cayman Third Parties, or those acting on their behalf, and payment records showing the payment of such invoices including but not limited to:

      i. details of the bank from which payments were made; and

      ii. supporting information to enable payments to be made including payee due diligence records obtained.

20.   The requested documents will identify the individuals associated with the Cayman Third Parties, including members, directors, and ultimate beneficial owners, who were involved with Defendants in the fraudulent scheme.

21.   The CSPs are likely to be in possession of the documents described above, because:

a. they are required to maintain them by statute (items 19(a)-(h)), or

b. in respect of correspondence, agreements, and transaction records (items 19(i)-(n), they were themselves party to such correspondence, agreements, and transactions.

22. SKAT seeks the following documents in respect of each Cayman Third Party that is a limited partnership:

a. Certificate of registration;

b. Declaration filed by the general partners to effect registration of the limited partnership pursuant to section 49 of the Partnership Law (2013 Revision);

c. Declaration filed by the general partners pursuant to section 51 of the Partnership Law (2013 Revision);

d. Books of Account;

e. Records identifying the beneficial owners pursuant to the Anti-Money Laundering Regulations;

f. Customer due diligence records obtained by the CSP pursuant to the Anti-Money Laundering Regulations;

g. Correspondence between clients of record and the CSP;

h. Correspondence between partners and the CSP;

i. Agreements for the provision of corporate services between the CSP and the Cayman Third Parties, or those acting on their behalf; and

j. Invoices issued by the CSP to any of the Cayman Third Parties, or those acting on their behalf, and payment records showing the payment of such invoices, including but not limited to:

i. details of the bank from which payments were made; and

       ii. supporting information to enable payments to be made including payee due diligence records obtained.

23. The requested documents will identify the individuals associated with the Cayman Third Parties, including members, directors, and ultimate beneficial owners, who were involved with Defendants in the fraudulent scheme.

24. The CSPs are likely to be in possession of the documents described above, because:

    a. they are required to maintain them by statute (items 22(e) and (f));

    b. in respect of correspondence, agreements, and transaction records (items 22(g)-(j)), they were themselves party to such correspondence, agreements, and transactions;

    c. in respect of the remaining documents, they are usually maintained by CSPs in the Cayman Islands.

## III. INVOLVMENT OF THE CAYMAN THIRD PARTIES

25. As set out above, the Cayman Third Parties were involved in the fraudulent scheme either as Trading Counterparties that were used to generate false records, or as Conduit Entities to which the proceeds of the fraudulent scheme were forwarded.

### A. Fraudulent Trading

26. Defendants' fraudulent scheme involved a number of Trading Counterparties, including the Cayman Third Parties and other entities, which were used to create false, fictitious book entry transactions and records that purported to reflect the purchase, transfer, or ownership of Danish Securities. Defendants relied on the Cayman Third Parties (and other entities) to

conduct the fraudulent transactions that generated records purporting to evidence their purchase of shares.

27. Defendants purported to purchase fictitious shares in a circular transaction, the true nature of which was obscured by using a variety of Trading Counterparties that, in fact, were commonly owned and acting in concert. In essence, the purchaser would buy shares from a seller that did not own them; and the seller purported to borrow the (fictitious) shares from the buyer, using intermediaries to conceal the sham nature of the transaction. Specifically, the pension plan ("Plan Defendant") would buy the shares from a short seller ("Short Seller") through a broker or multiple brokers ("Broker") and lend the shares to an intermediary (or intermediaries) ("Stock Loan Intermediary"), which would lend the shares to the Short Seller that had "sold" the shares to the Plan Defendant in the first place. The legs of the fraudulent trading—the sale of purported shares from Short Seller to the Plan Defendant; the loan from the Plan Defendant to Stock Loan Intermediary; and the loan from Stock Loan Intermediary to Short Seller—all settled on the same date and at the same Custodian controlled by Shah.

28. The result of the fraudulent trading scheme was that each of the Trading Counterparties ended up with the same amount of cash and shares it held before the transaction (which is believed to be little to no actual holdings of either cash or securities), actual shares never needed to be exchanged, and actual shares never in fact needed to exist at all in order to generate the purported trading records that Defendants used to defraud SKAT.

29. Defendants also purported to sell the shares in forward and/or futures contracts to additional counterparties ("Forward Counterparties") to hedge market risks associated with their purported purchase of shares and potentially to transfer and/or distribute portions of the refund payments to other entities and individuals involved with the fraudulent scheme.

11

30. Attached as Exhibit 4 is a document from Solo Capital Partners LLP, one of the Shah-controlled Custodians used by the Defendants, which sets out the fraudulent trading structure described above, with Solo Capital Partners acting as the Custodian.[3] The fraudulent transactions illustrated in Exhibit 4 and described herein were then used to create false "credit advices," "income advices," "tax vouchers," or similar documents that Defendants submitted to SKAT to support their fraudulent applications. Other Shah-controlled Custodians include Old Park Lane Capital PLC, Telesto Markets LLP, and West Point Derivatives Ltd.

### 1. Short Sellers

31. Trading Counterparties (including several Cayman Third Parties), acting as Short Sellers, generated trading records that purported to show the sale of shares, the borrowing of shares through stock loans, and the purchase of forward and/or future contracts.

32. The Short Sellers' participation in the fraudulent trading scheme is evidenced by the fact that they never owned the shares they purported to sell: the sale was covered with a stock loan that settled with the same shares that had already been purportedly sold.

33. Attached as Exhibit 5 is an example of a trading record purporting to show the sale of shares by Cayman Short Sellers.

34. Cayman Short Sellers include:

| Entity | CSP |
|---|---|
| SPK 23 (Cayman) Inc. | Campbells |
| Abra Holdings (Cayman) Inc. | Forbes Hare |
| Black Square Ltd | Harneys (Cayman) |
| Chem Capital | Harneys (Cayman) |
| D.D.C (Cayman) | Harneys (Cayman) |
| DE Market View | Harneys (Cayman) |
| Glendale Market Consultants | Harneys (Cayman) |

---

3. Exhibit 4 was obtained from a production made by the defendants in SKAT's action pending before the DIFC court against Elysium, which was in possession of documents from Solo Capital Partners.

| | |
|---|---|
| Greytek Capital Ltd. | Harneys (Cayman) |
| Metis Cayman Limited | Harneys (Cayman) |
| Opal Capital | Harneys (Cayman) |
| Procap Trading | Harneys (Cayman) |
| RDKS Consultants | Harneys (Cayman) |

### 2.     Brokers

35.     Trading Counterparties, acting as Brokers, facilitated the purported sale of shares between Short Sellers and Plan Defendants.  The Short Sellers never owned the shares they purported to sell, and therefore the Brokers purported to sell to Plan Defendants shares that did not exist.  The Brokers' involvement in the fraudulent trading scheme is evidenced by the trading records purporting to document their purchase and sale of shares.

36.     Brokers include the Cayman Third Party Ballygate Capital Limited.  *See* Exhibit 6.  CO Services acted as the CSP for Ballygate Capital Limited.

### 3.     Stock Loan Intermediaries

37.     Trading Counterparties (including a number of Cayman Third Parties), acting as Stock Loan Intermediaries, entered into sham loans that Short Sellers used to cover their purported equity sales.  The Stock Loan Intermediaries' involvement in the fraudulent trading scheme is evidenced by the fact that the stock loans settled with the same shares that the Short Sellers had purported to sell, allowing the Short Sellers to cover their sales with shares that did not exist.  Further, it appears that the Stock Loan Intermediaries were not adequately capitalized to be borrowers in a stock loan, even had actual shares been at stake:  they could not have provided the necessary collateral to enable lenders (here, Plan Defendants) to pay for shares.  Attached as Exhibit 7 is an example of an account statement from a Shah-controlled custodian purporting to show a stock loan between a Plan Defendant and Stock Loan Intermediary.  Ex. 7

at 78YORK00000078.  Attached as <u>Exhibit 8</u> is an example of a Global Master Securities Lending Agreement ("<u>GMSLA</u>") that existed between Stock Loan Intermediaries and Plan Defendants.

    38.    Cayman Stock Loan Intermediaries include:

| Entity | CSP |
|---|---|
| Esengi Ltd | Bell Rock |
| Colbrook Ltd | Harneys (Cayman) |
| Kentaurus Limited | Harneys (Cayman) |
| Leda Cayman Limited | Harneys (Cayman) |
| Neoteric Limited | Harneys (Cayman) |
| Aquila (Cayman) Limited | Trident |

    **4.**    **Forward Counterparties**

    39.    The Forward Counterparties (including a number of Cayman Third Parties) supposedly allowed Defendants to hedge the market risks associated with their purported purchase of shares and potentially to transfer and/or distribute portions of the refund payments made by SKAT to the Forward Counterparties and other entities involved with the fraudulent scheme.  Specifically, the Forward Counterparties entered into a series of offsetting forward/futures contracts with the Defendants that used non-market prices for the relevant underlying Danish security.  When these forward/futures contracts were netted, the differential pricing would give rise to a cash receivable between the Forward Counterparty and Plan Defendant that would be settled with the proceeds of the fraudulent refund request.[4]  Accordingly, the structure of the forward/futures contracts provided a means by which the Forward Counterparties may have received a portion of the DWT refund, some of which may have been distributed to other entities involved in the fraud.

---

4.    As forward/futures contracts can be cash-settled, as opposed to physically-settled, the parties were never required to transfer any real shares when netting out the various forward/futures contracts.

40.     Attached as Exhibit 9 is an example of an account statement from a Shah-controlled custodian purporting to show a series of forward trades between a Plan Defendant and Forward Counterparty.  Ex. 9 at ACKVIEW00000088-90.

41.     Cayman Forward Counterparties include:

| Entity | CSP |
|---|---|
| T & S Capital | Harneys (Cayman) |
| Amalthea Enterprises Ltd. | Sterling Trust |
| Cork Oak Capital Ltd. | Sterling Trust |
| Sherwood Enterprises Ltd. | Sterling Trust |

**B.     Conduits for Distribution of the Proceeds of Fraudulent Dividend Refund Claims**

42.     The proceeds of the fraudulent refund claims were ultimately shared among the various parties involved in the fraudulent scheme.  Shah, through his companies, took the vast majority of the refund proceeds related to the Defendant Plans that used Shah related custodians.  The pension plans ended up with a small fraction of the proceeds, further evidencing the fraudulent nature of the scheme.  The refunds appear to have been distributed among various entities ("Conduit Entities"), primarily through a false invoicing system, charging for services that were never actually rendered, in order to conceal the true nature of the relationships between the parties involved.  Certain Cayman Third Parties were Conduit Entities.

43.     A large majority of the proceeds of the fraudulent claims went to Ganymede Cayman Ltd. ("Ganymede"), ultimately owned by Shah, or to other entities controlled by Shah associates, ostensibly for services that Ganymede provided to the pension plans.  SKAT has obtained copies of invoices from entities owned by Shah or his associates, attributing the fees due to, *e.g.*, "services agreement," "Advisory Services Agreement," or "Tax Reclaim Advisory Services."  Attached as Exhibit 10 is an example of an invoice from Ganymede to a pension

plan. Internal Elysium documents indicate that Ganymede was owned and controlled by Shah. *See* <u>Exhibit 11</u> at 6 (showing that Ganymede is 100% owned by Elysium Global (Dubai) Limited and that Shah acted as Ganymede's director); <u>Exhibit 12</u> (showing that Elysium Global (Dubai) Limited is 100% owned by Shah). Shah's control of Ganymede was effected through IP Universal Limited. Director searches at the Cayman Islands General Registry establish that IP Universal is the listed director of Ganymede, and that Shah is the listed director of IP Universal in the Cayman Islands.[5] For this reason, SKAT also seeks documents from IP Universal's former CSP, Walkers. Similar arrangements to those described above regarding Ganymede were made with Siladen Ltd and Worldwide Asset Management Limited, vehicles believed to be owned and controlled by former associates of Shah.

44. Through a further series of fraudulent invoices, the proceeds of the fraudulent reclaims cycled from Ganymede and similar vehicles either directly to certain Defendants (via Defendant-controlled Conduit Entity companies in the Caymans)[6] and Trading Counterparties, or first to other Conduit Entities and then to certain Defendants (via Defendant-controlled companies) and Trading Counterparties. Attached as <u>Exhibit 13</u> is an example of an invoice from a Defendant-controlled company to Ganymede in unspecified fees (in this case, First Alton Inc., a Florida entity believed to be owned by Defendant Roger Lehman, to Ganymede for $2,012,559 in "Advisory Fees"). Attached as <u>Exhibit 14</u> is an example of a consultancy services

---

5. This has been confirmed by an in-person director search of the Cayman Islands General Registry conducted by Kobre & Kim (Cayman) on March 6, 2020 in respect of Ganymede and IP Universal Limited in the Cayman Islands.

6. Based on the information reviewed by Plaintiff SKAT to date, Plaintiff has reason to believe that ultimate beneficial owners ("<u>UBO</u>") of these companies included, but were not limited to, the following Defendants: Roger Lehman was UBO of First Alton Inc. and SSM LLC; Doston Bradley was UBO of India Atlantic Inc., Atlantic India Inc., Pacific India Inc., and India North Atlantic Inc.; Matthew Tucci was UBO of Icon Beach Inc., Starfish Dunes Inc., Sand Dollar Inc., and Lava Beach Inc.; Gavin Crescenzo was UBO of Comisana Inc. and Saba Inc.

agreement between a Defendant-controlled company, again First Alton Inc., and a Conduit Entity, again Ganymede.

    45.    Cayman Conduits Entities include:

| Entity | CSP |
|---|---|
| Worldwide Asset Management Limited | Campbells |
| Hertfordshire Ltd. | DMS |
| Omega Investments, LP | Genesis |
| Ganymede Cayman Ltd. | Harneys (Cayman), Ocorian |
| Aduro Investments LP | Intertrust |
| Pintal GP Limited | Intertrust |
| La Tresorerie Management Limited | Vistra (Cayman) |
| IP Universal Limited | Walkers |
| Westview GP Limited | Walkers |

\* \* \* \* \*

I, NEIL J. OXFORD, hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       April 27, 2020

                            /s/ Neil J. Oxford
                            NEIL J. OXFORD